FINE JEWELRY SALES CONCESSION AGREEMENT

This Fine Jewelry Sales Concession Agreement ("**Agreement**") shall be effective as of the 1st day of August, 2023 (the "**Effective Date**"), and is between PRINCESS CRUISE LINES, LTD., a Bermuda company with offices at 24305 Town Center Drive, Santa Clarita, California 91355 ("**Company**"), and Crown Jewels by Diamonds International, Corp., a Florida corporation with offices at 2201 SW 145th Ave., Suite 201, Miramar, FL 33027 ("**Concessionaire**").

## BACKGROUND

(A)  PCL is or will become the owner and/or operator of the passenger cruise vessel Sun Princess listed at Schedule 1 to this Agreement (the "**Vessel(s)**"). This Agreement will commence with one Vessel.  However, this Agreement is drafted such that the parties may agree to add additional vessels within the scope of the Agreement at a future date.  Each Vessel features a fine jewelry boutique which the parties intend will all be occupied by Concessionaire for the operation of the Business (as defined below in Article 1.1 below) (collectively the "**Boutiques**");

(B)  Concessionaire is engaged in business as a designer and retailer of fine jewelry; and

(C)  Company desires to grant to Concessionaire a concession for the operation of a fine jewelry boutique onboard the Vessel(s) to purchase, sell and supply fine jewelry merchandise, and Concessionaire wishes to accept and operate such concession, for the consideration set forth in, and subject to all the terms and conditions of, this Agreement.

THE PARTIES HEREBY AGREE AS FOLLOWS:

ARTICLE 1    DESCRIPTION OF BUSINESS

1.1    <u>Business</u>.

(a)    Subject to the provisions of sub-article 1.1 (c) below, Company hereby grants to Concessionaire the exclusive concession for the operation of a Diamonds International branded fine jewelry boutique (the "**Concessionaire Boutique(s)**") onboard each of the Vessel(s) to purchase, sell and supply the Merchandise (the "**Business**").  For purposes hereof, "**Merchandise**" is defined as (a) all loose diamonds or other precious or semi-precious gemstones and pearls, (b) all Concessionaire-branded jewelry, De Beers branded jewelry, Crown of Light, and any other proprietary Concessionaire-owned brand jewelry including, without limitation, rings, earrings, bracelets, necklaces, charms, pendants, and broaches, each with a retail price at or above five hundred dollars ($500.00), and (c) jewelry with a retail price below $500 that is offered as a part of a Company approved marketing promotion or otherwise authorized by Company.  Concessionaire may also offer special orders, paid in full within the voyage, as Merchandise.  The parties acknowledge and agree that Merchandise shall consist primarily of Concessionaire branded Merchandise and with the mutual agreement of Company & Concessionaire may be supplemented with non-Concessionaire branded Merchandise. Concessionaire shall consult with Company with respect to its Merchandise assortment decisions.

(b)    Company hereby grants to Concessionaire the exclusive right to purchase, sell and supply Concessionaire-branded Merchandise, De Beers branded Merchandise, Crown of Light Merchandise, and any other proprietary Concessionaire-owned brand, all subject to the definition of Merchandise and pricing set forth above (the "**Exclusive Merchandise**").  Subject to the provisions of sub-article 1.1(c) below, neither Company nor any of its affiliates shall engage in, nor grant any permission, license or concession to any third party to engage in, the regular sale of Exclusive Merchandise onboard the Vessel(s) during the Term (as defined below).  Provided, however, the prohibition contained in this Sub-Article shall not apply to pop-up shops, limited time experiences, charter or event merchandise, trunk shows, or the like.  With respect to any or all of the remaining vessels in Company's fleet, nothing herein shall restrict or prevent PCL from (i) continuing to operate its existing fine jewelry boutiques (ii) establishing new fine jewelry boutiques; or (iii) entering into similar arrangements, whether by concession or otherwise, with third parties for the operation of fine jewelry

boutiques, or (vi) the operation of trunk shows. Similarly, nothing herein shall prevent Concessionaire or any of its affiliated entities from (i) operating jewelry boutiques, (ii) conducting trunk shows, (iii) selling or consigning jewelry and providing sales training and support to any other third party, including any other cruise line. The Exclusive Merchandise rights granted in this Sub-Article shall apply solely to the sale of physical Merchandise onboard the Vessels. The parties agree that the Exclusive Merchandise shall not be interpreted to mean any of the following: digital or online sales, NFTs (Non-Fungible Tokens), immersive experiences (whether physical or digital), virtual reality (e.g. metaverse or Mirror World) experiences, or any other digital or online platform, whether offering for sale physical or digital fine jewelry or other categories of merchandise.

(c)     Notwithstanding the provisions of sub-articles 1.1(a) and 1.1(b) above, the parties agree that if any Vessel(s) is deployed, subsequently deployed or is scheduled to be deployed in Asia, Company shall be free to enter into any commercial arrangement whatsoever for the sale of fine jewelry Merchandise onboard that Vessel, whether by concession or otherwise, during the Vessel's deployment in Asia. In such event, the parties will enter into good-faith discussions regarding whether the Minimum Revenue Guarantee should continue to apply to such Vessel(s).

(d)     For the avoidance of doubt, the parties agree that the sale onboard the Vessels of watches shall not be permitted without the prior approval of Company.

(e)     Concessionaire is and shall remain the owner of all Merchandise, retaining full title to each item of Merchandise until its sale by Concessionaire pursuant to the terms of this Agreement. Except in the case of the occurrence of events described in Section 23.3 of this Agreement, Company shall acquire no right, title or interest in any Merchandise and hereby agrees not to challenge, or cooperate with any challenge, to Concessionaire's right, title and interest in and to the Merchandise. Notwithstanding the foregoing, if it is determined that Company has some interest in the Merchandise, by operation of law, Company hereby waives, relinquishes and releases any and all right, title, interest or lien in and to the Merchandise and agrees not to challenge, or cooperate with any challenge, to Concessionaire's right, title and interest in and to the Merchandise.

1.2     Term.  This Agreement is effective as of the first revenue sailing of a Vessel, unless terminated earlier in accordance with the provisions of Article 23, shall remain in force for a period of two (2) years (the "**Initial Term**").     Concessionaire hereby grants to Company two options exercisable by Company, in Company's sole and absolute discretion, at least sixty days prior to expiration of the Initial Term or Renewal Term, as the case may be, to extend the term of this Agreement for an additional period of one (1) year (the "**Renewal Term**" and together with the "Initial Term" being referred to hereinafter as the "**Term**"). Except for the first Annual Period (as defined below), which shall commence on the Effective Date and end on November 30 and the last Annual Period which shall end upon expiration or earlier termination of the Agreement, each twelve (12) month period during the Term beginning December 1 and ending on November 30 of the following year is an "**Annual Period**" hereunder. Except as otherwise agreed by the parties in writing, Concessionaire shall retain its concession rights under this Agreement for any voyage that begins during the term of this Agreement and ends after the termination of this Agreement. A voyage will be included solely in the calendar month in which the voyage ends.

























5.5     Revenue Guarantees.

(a)     PCD-Based Minimum Revenue Guarantee. "**Minimum Revenue Guarantee**" means, for each Annual Period during the Term (prorated for the first and last applicable Annual Period), a minimum net Company Revenue guarantee in favor of Company of US$5.00 per Revenue Guest per cruise day (Revenue Guest cruise days hereinafter referred to as "**PCDs**"). Following the first Annual Period, the Minimum Revenue Guarantee shall increase by five percent (5%) at the beginning of each Annual Period during the Term of this Agreement including any Renewal Terms. For the avoidance of doubt, (i) the date of embarkation shall be counted as a PCD, but the date of disembarkation shall not, and (ii) Days that Concessionaire is not able to operate the Concessionaire Boutique due to a Force Majeure Event (as defined by Article 18) shall not be counted as a PCD. Within thirty (30) days of the end of each fiscal quarter of Company during the Term (each a "Quarterly Period"), Company shall calculate (i) the Minimum Revenue Guarantee for that Quarterly Period based on the actual PCDs achieved and (ii) the Company Revenue for the Quarterly Period, and will provide Concessionaire with its calculation and the resulting amounts for each. If, for any given Quarterly Period within an Annual Period, the amount of the Minimum Revenue Guarantee through that Quarterly Period is greater than the Company Revenue through that Quarterly Period, then Company shall so notify Concessionaire, and, unless reasonably disputed, within thirty (30) days of receipt of such notice, Concessionaire shall pay to Company the difference between (x) the Minimum Revenue Guarantee and (y) the Company Revenue for that Quarterly Period (each a "**Minimum Guarantee Payment**"). Quarterly Minimum Guarantee Payments owed by Concessionaire shall be deducted against the first Concessionaire Revenue payment which would otherwise be due and payable by Company to Concessionaire in the next Quarterly Period. If, for any Quarterly Period within a given Annual Period, the amount of the Company Revenue through that Quarterly Period is greater than the Minimum Revenue Guarantee through that Quarterly Period, then Concessionaire shall be deemed to have a credit for such surplus, and the surplus shall be credited against subsequent quarterly Minimum Guarantee Payments payable within the same Annual Period by Concessionaire to Company on account of the Minimum Revenue Guarantee. The parties acknowledge and agree that any surplus may only be applied in the Annual Period in which it arises and may not be carried over into any subsequent Annual Period. Within 30 days of the end of each Annual Period, Company shall calculate the Minimum Revenue Guarantee applicable to that Annual Period. If, at the end of any Annual Period, (prorated for partial years in the event of expiration or earlier termination of the Agreement) (i) Company is owed a Minimum Guarantee Payment, Company will so notify Concessionaire and provide the Minimum Revenue Guarantee calculation, and Concessionaire will pay the Minimum Guarantee Payment within 30 days of receipt of such notice, or (ii) Concessionaire is owed a reimbursement for overpayment of the Minimum Revenue Guarantee for the Annual Period based on prior Minimum Guarantee Payments deducted in the same Annual Period, Company will so notify Concessionaire and provide the Minimum Revenue Guarantee calculation and the overpayment amount, and Company will reimburse Concessionaire the overpayment within 30 days of Concessionaire's invoice for same. For the

avoidance of doubt, the Minimum Revenue Guarantee shall not be construed as a maximum payment allowable to Company under this Agreement. The parties further agree that, in the event Concessionaire joins Company's Port Shopping Program, any sales made by Concessionaire-affiliated port retail stores pursuant to the Port Shopping Program shall not count towards Company Revenue for purposes of this Article 5.5(a). A Minimum Revenue Guarantee sample calculation is attached hereto as Schedule 10.











## ARTICLE 7    GUARANTEE AGREEMENT

7.1    <u>Guarantee Agreement</u>.  Upon execution of this Agreement, Concessionaire shall provide a Guarantee Agreement from its affiliate, Almod Diamonds Ltd., Inc., as guarantor, in form and substance identical to Exhibit A attached hereto (the "**Guarantee Agreement**").















































IN WITNESS WHEREOF, Company and Concessionaire have executed this Agreement on the date referenced below.

PRINCESS CRUISE LINES LTD.

By: _____

Name:   John Padgett

Title:   President

Date:   11 / 6 / 2023

CROWN JEWELS BY DIAMONDS INTERNATIONAL, CORP.

By: _____

Name:   Albert Gad

Title:   Director   Pres. CEO

Date:   OCT 13, 2023





































## EXHIBIT A

## Guarantee Agreement

This Guarantee Agreement ("**Guarantee Agreement**"), effective as of _____, given by Almod Diamonds Ltd., Inc. (the "**Guarantor**"), a corporation organized under the laws of New York, is given to induce Princess Cruise Lines, Ltd. (**"Company"**) to enter into the Fine Jewelry Sales Concession Agreement (as such agreement may be amended, modified or extended from time to time by its parties) (the "**Agreement**") effective as of _____, between Company and Crown Jewels by Diamonds International ("**Concessionaire**"). This Guarantee Agreement provides for the guarantee referred to in Article 7 of the Agreement. Capitalized terms used and not defined herein shall have the meaning given to them in the Agreement.

## BACKGROUND

1. The Guarantor is an affiliate of and the principal supplier of merchandise to Concessionaire; and

2. As a material inducement to Company to enter into the Agreement, the Guarantor has agreed to issue in favor of Company, this Guarantee Agreement pursuant to which the Guarantor guarantees all of the Payment Obligations (as defined below). This Guarantee Agreement shall be issued contemporaneously with the execution of the Agreement.

THE PARTIES HEREBY AGREE AS FOLLOWS:

1. Obligations of the Guarantor. The Guarantor irrevocably, absolutely and unconditionally guarantees to Company, its successors and assigns (whether collateral assigns or otherwise), the prompt and full payment in United States currency and performance of the Payment Obligations (defined below) and agrees in the event Concessionaire fails to fully and timely perform said Payment Obligations, to fully and timely perform same immediately upon demand. "**Payment Obligations**" means the Minimum Revenue Guarantee (as such term is defined in the Agreement), not subject of a bona fide dispute, and includes, without limitation, (i) all principal and interest (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of Concessionaire, whether or not allowed in such proceeding), and (ii) all reasonable costs and expenses of collection after demand for payment of the Minimum Revenue Guarantee to Concessionaire by Company, including reasonable attorneys' fees, in the event that Company obtains a judgment against Concessionaire in the amount sought in any complaint filed against Concessionaire with respect to the Minimum Revenue Guarantee.

2. Consent to Company Acts. The Guarantor agrees, without affecting in any way the Guarantor's liability to Company hereunder, that Company may, without notice to or consent of the Guarantor and upon such terms as it may deem advisable and with or without consideration and after notice of cancellation is received by Company: (a) extend, in whole or in part, by renewal or otherwise, and as often as Company may wish, the time of payment of any indebtedness owing by Concessionaire, to Company, or held by Company as security for the Payment Obligations; (b) release, surrender, exchange, modify, impair, or extend the period of duration, or the time for performance or payment, of any collateral securing the Payment Obligations; (c) settle or compromise any claim of Company against Concessionaire, or against any other person, firm or corporation, whose obligation is held by Company as collateral security for the Payment Obligations; (d) release in whole or in part any person liable for the payment of the Payment Obligations, including, but not limited to, any other guarantor or any person liable as an endorser, guarantor or judgment debtor (if Company obtains a judgment) on the Payment Obligations and, in any event, such release shall not affect the liability of the Guarantor for the entire amount of the Payment Obligations; and (e) generally deal with Concessionaire or any of the security for the Payment Obligations or other person or party as Company may see fit. Further, Company shall not be under any obligation whatsoever to obtain or perfect or to maintain the perfection of any security interest or other lien on property to secure indebtedness of Concessionaire to Company or the obligations of the Guarantor hereunder and Company shall have no obligation to, and shall not have any liability for failing to, obtain or perfect or to maintain the perfection of any security interest or lien on property to secure indebtedness of

Concessionaire or the obligations of the Guarantor hereunder. Any failure of Company to obtain and perfect or to maintain the perfection of any security interest or lien shall not affect in any way whatsoever the obligations of the Guarantor to Company under this Guarantee Agreement. The Guarantor hereby ratifies and confirms any such extension, renewal, release, surrender, exchange, modification, impairment, settlement, or compromise, and all such actions shall be binding upon the Guarantor who hereby waives all defense, counterclaims or offsets which the Guarantor might otherwise have by reason thereof.

3. Waivers by Guarantor. The Guarantor waives notice of acceptance of this Guarantee Agreement by Company.

4. Remedies of Company. Company may proceed against the Guarantor to collect any obligation covered by this Guarantee Agreement, only after proceeding against Concessionaire for the Payment Obligations, or any other person, firm or corporation liable for the Payment Obligations, but without first resorting to any property at any time held by Company as collateral security for the Payment Obligations or the obligations under this Guarantee Agreement, and without any marshalling of assets whatsoever. Company will notify the Guarantor in writing that it has elected to proceed against the Guarantor in any such case (the **"Guarantee Call Notice"**). All of Company's rights and remedies shall be cumulative and any failure of Company to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time, and from time to time, thereafter.

5. Bankruptcy of Concessionaire. Notwithstanding that this Guarantee Agreement may have been cancelled and/or returned to the Guarantor, to the extent Concessionaire has made any payments to Company within the ninety (90) day period following the date this Guarantee Agreement was so cancelled and/or returned to the Guarantor, and the Guarantor was obligated under this Guarantee Agreement for said payments, the liability of the Guarantor hereunder shall at all times continue for the amounts so paid by Concessionaire to Company. If, for any reason, (e.g. bankruptcy, or otherwise), Company is not permitted to retain the payments so made by Concessionaire during said ninety (90) day period, the Guarantor shall be liable under this Guarantee Agreement for the amount of such payments as if this Guarantee Agreement had never been cancelled and Company shall be entitled to recover said amount so paid by Concessionaire within said ninety (90) day period. If Company shall have marked this Guarantee Agreement "Canceled" and/or returned this Guarantee Agreement to the Guarantor, and under the provisions of this Section 5, the Guarantor has continuing liability to Company for certain amounts which Company has or is obligated to return to Concessionaire, then, in such case, Company may enforce its rights under this Guarantee Agreement upon any copy of this Guarantee Agreement notwithstanding the fact that the original of this Guarantee Agreement may have been marked "Canceled" and/or returned to the Guarantor.

6. Construction and Benefit. This Guarantee Agreement is delivered and made in, and shall be construed pursuant to and governed by, the laws of the State of New York, and is binding upon the Guarantor and its legal representatives and successors, and shall inure to the benefit to Company, its successors and assigns.

7. Miscellaneous. In the event it becomes necessary for Company to exercise its rights under this Guarantee Agreement, whether suit be brought or not, the Guarantor shall be liable for all reasonable costs and attorney's' fees incurred by Company, including reasonable costs and attorney's' fees incurred by Company on appeal. In the further event Company obtains a final judgment against the Guarantor upon this Guarantee Agreement, the judgment shall bear interest at the judgment rate. Further, the Guarantor agrees that the proper venue for any action that may be brought under this Guarantee Agreement, in addition to any other venue permitted by law, shall be in Los Angeles County, California. Both Company and the Guarantor hereby waive trial by jury. This Guarantee Agreement shall be a continuing one and shall be binding upon the Guarantor regardless of how long before or after the date hereof any of the Obligations were or are incurred. The provisions of this Guarantee Agreement shall survive termination of the Agreement. The term "Company" shall be deemed to include any individual, partnership or corporation acting as its nominee or agent, and any of its corporate subsidiaries or affiliates, the stock or interest of which is owned or controlled, directly or indirectly, by it or by any affiliate of Company. The term "Concessionaire" shall include (a) any successor individual or individuals, association, partnership, corporation or other entity to which all or substantially all of the business or assets of Concessionaire shall have been transferred, (b) any new partnership which shall have been created by reason of the admission of any new partner or partners therein and/or the dissolution of the existing partnership by

death, resignation or other withdrawal of any partner, and (c) any other corporation into or with which Concessionaire shall have been merged, consolidated, reorganized, purchased or absorbed.

8. Complete Agreement. The whole of this Guarantee Agreement is herein set forth and, other than the Agreement, there is no verbal or other written agreement and no understanding or custom affecting the terms hereof. This Guarantee Agreement can be modified only by a written instrument signed by both parties.

9. Intentionally Deleted.

10. Notice. All notices, demands, requests and other communications, if any, required under this Guarantee Agreement may be given by email at the email address listed below which will be deemed received upon the sender's receipt of successful transmission, or by internationally recognized commercial air couriers (including FedEx and DHL) which will be deemed received upon receipt of evidence of delivery, addressed to the party for whom it is intended at its address set forth below. Any party may designate a change of address by written notice to the other party, received by such other party at least ten (10) days before such change of address is to become effective. The addresses for the purposes of this Section 10 are:

To:

Almod Diamonds Ltd., Inc.
Attn: Albert Gad
12 E. 49th Street, 39th Floor
New York, NY 10017


With Copy To: legal@diamondsinternational.com
mjreige@diamondsinternational.com


To:

Princess Cruise Lines, Ltd.
24305 Town Center Drive
Santa Clarita, CA 91355
        Attn:
With Copy To:

Daniel Howard
General Counsel
Email: dhoward@hagroup.com


11. Savings Clause. If any provision or portion of this Guarantee Agreement is declared or found by a court of competent jurisdiction to be unenforceable or null and void, such provision or portion thereof shall be deemed stricken and severed from this Guarantee Agreement, and the remaining provisions and portions thereof shall continue in full force and effect.

12. Assignment. This Guarantee Agreement may not be assigned or otherwise transferred by Guarantor without the prior written consent of Company, which may be withheld or delayed in Company's sole discretion.

13. Headings. The headings of Sections of this Guarantee Agreement are for convenient reference only, and shall not affect the construction or interpretation of any of the term and provisions set forth in this Guarantee Agreement.

IN WITNESS WHEREOF, the Guarantor intending to be legally bound hereby has signed this Guarantee Agreement effective as of the date first written above.

By: _____

Name:   Albert Gad

Title:   President & CEO

Date:   OCT 19, 2023















































